20 MISC 203

Judge Castel

# TAB 5

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**20 MISC 203**

IN RE:

*EX PARTE* APPLICATION UNDER 28
U.S.C. § 1782 TO TAKE DISCOVERY
FROM THE CLEARING HOUSE
PAYMENTS COMPANY L.L.C. AND
THE FEDERAL RESERVE BANK OF
NEW YORK

Case No. _____

Judge Castel

MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION
UNDER 28 U.S.C. § 1782 TO TAKE DISCOVERY FROM
THE CLEARING HOUSE PAYMENTS COMPANY L.L.C. AND
THE FEDERAL RESERVE BANK OF NEW YORK

# TABLE OF CONTENTS

      Page

TABLE OF AUTHORITIES ................................................................................................................ii

PRELIMINARY STATEMENT ..........................................................................................................1

JURISDICTION AND VENUE ..........................................................................................................3

FACTUAL BACKGROUND ..............................................................................................................3

    I.   Benedek Family ..........................................................................................................3

    II.   Emanuel's Businesses and Properties ........................................................................5

    III.  Emanuel's Wealth Preservation Plan .........................................................................6

    IV.  Emanuel's Gift in Life to Alexandre—Sestini ........................................................11

    V.   Emanuel's Death and the Probate Proceedings ......................................................13

    VI.  Concealment of Assets ............................................................................................14

    VII. The Brazilian Proceedings .......................................................................................15

    VIII.  The Required Discovery .........................................................................................17

ARGUMENT ....................................................................................................................................19

    I.   THE § 1782 APPLICATION MEETS EACH OF THE STATUTORY
       REQUIREMENTS FOR DISCOVERY .................................................................19

       A.  The Discovery Subjects Reside or Are Found in the Southern District of New York ...20

       B.  The Requested Discovery Is Sought for Use in a Proceeding Before a Foreign
           Tribunal ...........................................................................................................21

       C.  The Application Is Made By "Interested Persons" ........................................22

    II.  EACH OF THE DISCRETIONARY FACTORS WEIGHS STRONGLY IN FAVOR
       OF GRANTING THE APPLICATION .................................................................23

       A.  The Discovery Subjects Are Not Participants in the Brazilian Proceedings ............24

       B.  The Nature of the Brazilian Court, the Character of the Brazilian Proceedings, and
           the Receptivity of the Brazilian Court Support Granting the Discovery Requested ........24

       C.  The Applicants Do Not Seek to Circumvent Proof-Gathering Restrictions or Other
           Policies ............................................................................................................26

       D.  The Requested Discovery Is Relevant and Not Unduly Burdensome .....................27

    III.  EX PARTE RELIEF IS CUSTOMARY AND APPROPRIATE HERE ......................29

CONCLUSION .................................................................................................................................30

## TABLE OF AUTHORITIES

<u>CASES</u>

*Application of Malev Hungarian Airlines,*
   964 F.2d 97 (2d Cir. 1992) ..........................................................................................23

*Brandi-Dohrn v. IKB Deutsche Industriebank AG,*
   673 F.3d 76 (2d Cir. 2012) ....................................................................................23, 25

*Chevron Corp. v. Berlinger,*
   629 F.3d 297 (2d Cir. 2011) ........................................................................................24

*Esses v. Hanania,*
   101 F.3d 873 (2d Cir. 1996) .........................................................................................29

*Euromepa, S.A. v. R. Esmerian, Inc.,*
   154 F.3d 24 (2d Cir. 1998) ...........................................................................................21

*Fleischmann v. McDonald's Corp. (In re Application for an Order for Judicial Assistance in
a Foreign Proceeding in the Labor Court of Braz.),*
   466 F. Supp. 2d 1020, 1034 (N.D. Ill. 2006) ........................................................25, 27

*Gov't of Mong. v. Itera Int'l Energy,*
   No. 3:08-mc-46-J-32MCR, 2009 U.S. Dist. LEXIS 144214 (M.D. Fla. Nov. 10, 2009)....20

*Gushlak v. Gushlak,*
   486 Fed. App'x 215 (2d Cir. 2002) .............................................................................29

*In re Accent Delight Int'l Ltd.,*
   869 F.3d 121 (2d Cir. 2017) .........................................................................................21

*In re Apostolos Mangouras to Conduct Discovery for Use in a Foreign Proceeding Pursuant
to 28 U.S.C. 1782,*
   No. 17-mc-172, 2017 U.S. Dist. LEXIS 179534, 2017 WL 4990655 (S.D.N.Y. Oct. 30,
   2017) ..............................................................................................................................26

*In re Application of Chevron Corp.,*
   709 F. Supp. 2d 283 (S.D.N.Y. 2008) ........................................................................24

*In re Application of de Araujo Bertolla,*
   No. 1:17-mc-284 (S.D.N.Y. Nov. 13, 2017) ...............................................................28

*In re Application of Grupo Qumma,*
   No. M 8-85, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486 (S.D.N.Y. Apr. 22, 2005)...23

*In re Application of Hill,*
   No. M 19-117 (RJH), 2007 WL 1226141 (S.D.N.Y. Apr. 23, 2007) ..........................26

*In re Application of Inversiones y Gasolinera Petroleos Venezuela,*
No. 08-20378-MC, 2011 U.S. Dist. LEXIS 5201, 2011 WL 181311 (S.D. Fla. Jan. 19,
2011) ............................................................................................................................28

*In re Application of Iraq Telecom Ltd.,*
No. 18-MC-458 (LGS) (OTW), 2019 U.S. Dist. LEXIS 176149, 2019 WL 5080007
(S.D.N.Y. Oct. 10, 2019) .............................................................................................22

In re Application of Societe d'Etude de Realisation et d'Exploitation Pour le Traitement du
Mais,
No. 13-MC-266, 2013 U.S. Dist. LEXIS 167219, 2013 WL 6164435 (E.D. Pa. Nov. 22,
2013) ............................................................................................................................29

*In Re Catalyst Managerial Services, Dmcc,*
No. 1:15-mc-408 (S.D.N.Y. Feb. 26, 2016) ...............................................................28

*In Re Cooperatieve Rabobank U.A. et al,*
No. 1:20-mc-89 (S.D.N.Y. Feb. 18, 2020) .................................................................28

*In re de Aquino Chad,*
No. 19mc261, 2019 U.S. Dist. LEXIS 100483, 2019 WL 2502060 (S.D.N.Y. Jun. 17,
2019) ............................................................................................................................27

*In re De Melo Pimenta,*
942 F. Supp. 2d 1282 (S.D. Fla. 2013) .......................................................................27

*In re del Valle Ruiz,*
939 F.3d 520 (2d Cir. 2019) ........................................................................................20

*In re Ex Parte Application of Kleimar N.V.,*
220 F. Supp. 3d 517 (S.D.N.Y. 2016) .........................................................................20

*In re Gemeinschaftspraxis Dr. Med. Schottdorf,*
No. M19-88 (BSJ), 2006 U.S. Dist. LEXIS 94161, 2006 WL 3844464 (S.D.N.Y. Dec. 29,
2006) ............................................................................................................................26

*In re Gorsoan Ltd.,*
No. 13 Misc. 397 (PGG), 2014 U.S. Dist. LEXIS 175613, 2014 WL 7232262 (S.D.N.Y.
Dec. 10, 2014), *aff'd sub nom. Gorsoan Ltd. & Gazprombank OJSC for an Order Pursuant
to 28 U.S.C. 1782 to Conduct Discovery v. Bullock,* 652 F. App'x 7 (2d. Cir. 2016)........27

In re Hornbeam Corp.,
No. 14 Misc. 424 (Part 1), 2015 U.S. Dist. LEXIS 142361 ........................................30

In re Ishihara Chem. Co.,
121 F. Supp. 2d 209 (E.D.N.Y. 2000) .........................................................................29

*In re Letter of Request from Crown Prosecution Service of United Kingdom,*
870 F.2d 686 (D.C. Cir. 1989) .....................................................................................22

In re Letter of Request from Supreme Court of Hong Kong,
138 F.R.D. 27 (S.D.N.Y. 1991) ............................................................................29, 30

*In re Mesa Power Group, LLC,*
    No. 2:11-mc-280-ES, 2012 U.S. Dist. LEXIS 179870, 2012 WL 6060941 (D.N.J. Nov. 20,
    2012)..........................................................................................................................29

*In re O'Keeffe,*
    646 F. App'x 263 (3d. Cir. 2016)..........................................................................26

*In re Pallares,*
    No. 10-cv-02528-PAB, 2010 U.S. Dist. LEXIS 115240, 2010 WL 4193072 (D. Colo. Oct.
    20, 2010)....................................................................................................................29

*In re Servicio Pan Americano de Proteccion,*
    354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) ..........................................................26

*In re Wilhelm,*
    470 F. Supp. 2d 409 (S.D.N.Y. 2007) ...................................................................22

*In The Matter of the Ex Parte Application of Andrew Reginald Yeo and Gess Michael*
    *Rambaldi,*
    No. 1:17-mc-484 (S.D.N.Y. Jan. 8, 2018)..............................................................29

*In The Matter of the Ex Parte Application of Andrew Reginald Yeo and Gess Michael*
    *Rambaldi,*
    No. 1:18-mc-483 (S.D.N.Y. Nov. 1, 2018) .............................................................29

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004)................................................................................3, 21, 22, 24

*Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.,*
    No. 14-CV-9997 (CM), 2015 U.S. Dist. LEXIS 18388, 2015 WL 3439220 (S.D.N.Y. Jan.
    6, 2015) ................................................................................................................22, 25

*Lirola v. Lanata,*
    No. 19-mc-80173-LB, 2019 U.S. Dist. LEXIS 117590 (N.D. Cal. Jul. 12, 2019)...............20

*Mees v. Buiter,*
    793 F.3d 291 (2d Cir. 2015) ...............................................................................22, 27

STATUTES AND RULES

28 U.S.C. § 1331...........................................................................................................3

28 U.S.C. § 1391...........................................................................................................3

28 U.S.C. § 1782...................................1, 2, 3, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30

Fed. R. Civ. P. 26........................................................................................................27

Fed. R. Civ. P. 45........................................................................................................29

*In re Mesa Power Group, LLC,*
  No. 2:11-mc-280-ES, 2012 U.S. Dist. LEXIS 179870, 2012 WL 6060941 (D.N.J. Nov. 20,
  2012) ................................................................................................................29

*In re O'Keeffe,*
  646 F. App'x 263 (3d. Cir. 2016)..................................................................26

*In re Pallares,*
  No. 10-cv-02528-PAB, 2010 U.S. Dist. LEXIS 115240, 2010 WL 4193072 (D. Colo. Oct.
  20, 2010) ..........................................................................................................29

*In re Servicio Pan Americano de Proteccion,*
  354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) ................................................26

*In re Wilhelm,*
  470 F. Supp. 2d 409 (S.D.N.Y. 2007) ........................................................22

*In The Matter of the Ex Parte Application of Andrew Reginald Yeo and Gess Michael
  Rambaldi,*
  No. 1:17-mc-484 (S.D.N.Y. Jan. 8, 2018)...................................................29

*In The Matter of the Ex Parte Application of Andrew Reginald Yeo and Gess Michael
  Rambaldi,*
  No. 1:18-mc-483 (S.D.N.Y. Nov. 1, 2018) .................................................29

*Intel Corp. v. Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004).....................................................................3, 21, 22, 24

*Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.,*
  No. 14-CV-9997 (CM), 2015 U.S. Dist. LEXIS 18388, 2015 WL 3439220 (S.D.N.Y. Jan.
  6, 2015) .......................................................................................................22, 25

*Lirola v. Lanata,*
  No. 19-mc-80173-LB, 2019 U.S. Dist. LEXIS 117590 (N.D. Cal. Jul. 12, 2019)..............20

*Mees v. Buiter,*
  793 F.3d 291 (2d Cir. 2015) .....................................................................22, 27

STATUTES AND RULES

28 U.S.C. § 1331......................................................................................................3

28 U.S.C. § 1391......................................................................................................3

28 U.S.C. § 1782...........................1, 2, 3, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30

Fed. R. Civ. P. 26....................................................................................................27

Fed. R. Civ. P. 45....................................................................................................29

in these foreign proceedings, as they are Plaintiffs with the right to submit evidence in the Brazilian Proceedings. Additionally, as explained below, the discretionary factors that this Court should consider in determining whether to grant an application under *Intel Corp. v. Advanced Micro Devices, Inc.* 542 U.S. 241, 264-65 (2004) also favor granting the § 1782 Application.

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1782(a). Venue in this District is proper under 28 U.S.C. § 1391 because the intended subpoena recipients are found in this District. CHIPS's headquarters are located at 1114 Avenue of the Americas, 17th floor, New York, NY 10036, *see* De Luca Decl., at ¶¶ 5, 9-10 and Exs. D-E,[2] and the Federal Reserve Bank's head office is located at 33 Liberty Street, 12th floor, New York, NY 10045, *see* De Luca Decl., at ¶¶ 5, 11 and Ex. F.[3]

## FACTUAL BACKGROUND

### I.    Benedek Family

Sylvia and Eliane were born in Brazil to Emanuel and Gertrudes Benedek, who were married in Brazil under a community property system, whereby the property of both spouses, whether acquired before or during the marriage, remains the joint property of both spouses — with some exceptions that are not relevant to this case. *See* Fraga Decl. at ¶ 3. Emanuel and

---

[2] Exs. D and E are the Clearing House's page on LinkedIn and a Company Investigation Report on the Clearing House, issued by Westlaw in March, 2020, respectively. They both point to the Clearing House's address at 1114 Avenue of the Americas, 17th floor, New York, NY 10036. *See also Public Disclosure of Legal, Governance, Risk Management, and Operating Framework*, THE CLEARING HOUSE 13 (Jun. 2018), https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/chips-public-disclosure-2018.pdf ("PaymentsCo [the Clearing House], which owns and operates CHIPS, is headquartered in New York City.").
[3] Ex. F is a Company Investigation Report on the Federal Reserve Bank, issued by Westlaw on March 24, 2020, pointing to the Federal Reserve Bank's address at 33 Liberty Street, 12th floor, New York, NY 10045. *See also Contacts*, FEDERAL RESERVE BANK OF NEW YORK, https://www.newyorkfed.org/contacts (last visited April 14, 2020) (Federal Reserve Bank's head office is located at 33 Liberty Street, New York, NY 10045).

3

in these foreign proceedings, as they are Plaintiffs with the right to submit evidence in the Brazilian Proceedings. Additionally, as explained below, the discretionary factors that this Court should consider in determining whether to grant an application under *Intel Corp. v. Advanced Micro Devices, Inc.* 542 U.S. 241, 264-65 (2004) also favor granting the § 1782 Application.

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1782(a). Venue in this District is proper under 28 U.S.C. § 1391 because the intended subpoena recipients are found in this District. CHIPS's headquarters are located at 1114 Avenue of the Americas, 17th floor, New York, NY 10036, *see* De Luca Decl., at ¶¶ 5, 9-10 and Exs. D-E,[2] and the Federal Reserve Bank's head office is located at 33 Liberty Street, 12th floor, New York, NY 10045, *see* De Luca Decl., at ¶¶ 5, 11 and Ex. F.[3]

## FACTUAL BACKGROUND

### I.    Benedek Family

Sylvia and Eliane were born in Brazil to Emanuel and Gertrudes Benedek, who were married in Brazil under a community property system, whereby the property of both spouses, whether acquired before or during the marriage, remains the joint property of both spouses – with some exceptions that are not relevant to this case. *See* Fraga Decl. at ¶ 3. Emanuel and

---

[2] Exs. D and E are the Clearing House's page on LinkedIn and a Company Investigation Report on the Clearing House, issued by Westlaw in March, 2020, respectively. They both point to the Clearing House's address at 1114 Avenue of the Americas, 17th floor, New York, NY 10036. *See also Public Disclosure of Legal, Governance, Risk Management, and Operating Framework*, THE CLEARING HOUSE 13 (Jun. 2018), https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/chips-public-disclosure-2018.pdf ("PaymentsCo [the Clearing House], which owns and operates CHIPS, is headquartered in New York City.").

[3] Ex. F is a Company Investigation Report on the Federal Reserve Bank, issued by Westlaw on March 24, 2020, pointing to the Federal Reserve Bank's address at 33 Liberty Street, 12th floor, New York, NY 10045. *See also Contacts*, FEDERAL RESERVE BANK OF NEW YORK, https://www.newyorkfed.org/contacts (last visited April 14, 2020) (Federal Reserve Bank's head office is located at 33 Liberty Street, New York, NY 10045).

Gertrudes had four other children: Alexandre, Vivian, Evelyn and Suzana. *Id.* at ¶ 4. All six

children were born and raised during Emanuel and Gertrudes' marriage, and all of them have

the same rights under applicable Brazilian family and intestacy laws. *Id.*

**Figure 1: The Benedek Family**



**Figure 2: The Moas Family**



Figure 3: The Klein Family



## II.    Emanuel's Businesses and Properties

Emanuel founded a business group named Germon's, which made and sold leather goods, including bags, suitcases, and shoes. *Id* at ¶ 5. The main company of the group was Mercantil Super Couros Ltda. ("Mercantil"), a limited liability company incorporated under Brazilian law, whose shareholders were (and still are, according to public certificates) Emanuel and Gertrudes. A Uruguayan company named Menirol Sociedad Anónima ("Menirol") was also a shareholder of Mercantil. *Id.* "Germon's" was the trading name used by Mercantil. *Id.*

Emanuel and Gertrudes were also the only shareholders of another limited liability company in Brazil named Moni's Empreendimentos e Participações Ltda. ("Moni's"),[4] which arose from a partial split of Mercantil. *Id.* at ¶ 6. Moni's focused on buying, selling, renting and managing its own real properties; Emanuel and Gertrudes used Moni's to buy and rent properties in São Paulo, Brazil's most prosperous real estate market. *Id.*

As a result of his successful career as an entrepreneur, Emanuel became a very wealthy man. *Id.* at ¶ 7. In the early 1990s, Emanuel and Gertrudes owned dozens of real properties, most of them in São Paulo. *Id.*

---

[4] "Moni" was Emanuel's nickname. *See* Fraga Decl. at ¶ 5 n. 2.

5

### III.    Emanuel's Wealth Preservation Plan

Early in the 1990s, Emanuel devised and implemented a wealth preservation plan. *Id.* at ¶ 8. To implement the plan, Emanuel crafted a complex corporate structure that would hold his and Gertrudes' assets and protect their net worth. *Id.* at ¶ 18. After the implementation of the plan, on paper, Emanuel and Gertrudes were no longer owners of the assets transferred to certain companies in Brazil and abroad, and were no longer shareholders of these companies. *Id.* In reality and in practice, however, Emanuel and Gertrudes were the beneficial owners of these companies and used people of trust to control the companies and all their assets. *Id.* Many of the assets that moved between these companies rightfully belong to Emanuel's estate and are subject to the Brazilian Proceedings.

At the end of 1994, Emanuel and Gertrudes began to transfer to and mortgage for the benefit of Menirol (a bearer share company in Uruguay),[5] the real properties that Emanuel and Gertrudes owned under their own names and under those of Mercantil and Moni's. *Id.* at ¶ 8. Emanuel and Gertrudes were the owners of Menirol. *Id.; see also* De Luca Decl. at ¶ 13-14 and Exs. H-I.[6] Emanuel and Gertrudes were also owners of Inversora Cadell Sociedad Anónima ("Inversora Cadell"), another bearer share company registered in Uruguay with its headquarters at the same address as a law firm associated with Emanuel's businesses. *See* Fraga Decl., at ¶ 8. Emanuel and Gertrudes also used Inversora Cadell to hold their assets. *Id.; see also* De Luca

---

[5] A bearer share is an equity security wholly owned by whoever holds the physical stock certificate, thus the name "bearer" share. The issuing firm neither registers the owner of the stock nor tracks transfers of ownership; the company disperses dividends to bearer shares when a physical coupon is presented to the firm. Because the share is not registered to any authority, transferring the ownership of the stock involves only delivering the physical document. *See* Fraga Decl., at ¶ 8 n. 3.

[6] In October 1993, Menirol's registered capital was of USD 1,097,500. *See* De Luca Decl. Ex. H. A Uruguayan law firm that provided services for Emanuel held the shares of Menirol in custody; these shares were worth USD 1,097,427.73 and were owned by Emanuel, Gertrudes and Arnaldo Segal (Eliane's husband) ("Arnaldo"). *See* De Luca Decl. Ex. I.

6

Decl. at ¶ 15 and Ex. J.[7]

On December 16, 1998, Emanuel, Gertrudes and Moni's—wholly owned by Emanuel and Gertrudes—became shareholders of a recently incorporated paper company[8] then named Zidane Empreendimentos e Participações Ltda. ("Zidane").[9] *See* Fraga Decl., at ¶ 9.   To become shareholders of this entity with neither business activities nor assets, Emanuel, Gertrudes and Moni's made a capital contribution of thirty real properties, which, together, were worth millions of Brazilian reais.[10] *Id.*  Among these real properties was the house in São Paulo where Emanuel and Gertrudes lived for decades. *Id.*

**Figure 4: The Formation of Zidane**



---

[7] The same Uruguayan law firm that held Menirol's shares also held the shares of Inversora Cadell in custody; these shares were owned by Emanuel, Gertrudes and Arnaldo. *See* De Luca Decl. Ex. J. Inversora Cadell is no longer an active company in Brazil. *See* Fraga Decl., at ¶ 8.

[8] A "paper company" is a non-operating but properly constituted and formed firm that exists only as a registration or incorporation certificate and has no assets.  Once constituted, the "paper company" is generally sold to businesspeople with real business intent, who want to start a business and wish to avoid the time-consuming process of incorporating a new firm. *See* Fraga Decl., at ¶ 9 n. 4.

[9] The entity's name later changed to Zidane Distribuidora Comercial e Administradora Ltda. Currently, its name is Zidane Imobiliária Comercial e Administradora Ltda. *See* Fraga Decl., at ¶ 9 n. 3.

[10] The "Brazilian real" or simply "real" is the official currency in Brazil.  In December 1998, one dollar was worth 1.20 real. The plural of "real" is "reais." The currency is also abbreviated as "BRL." *See* Fraga Decl., at ¶ 9 n. 6.

On April 19, 1999, Emanuel, Gertrudes and Moni's became the only shareholders of another paper company, with neither business activities nor assets, then named Djorkaeff Empreendimentos e Participações Ltda. and currently named Dorkaeff Comércio, Administração e Participação Ltda. ("Dorkaeff"). *Id.* at ¶ 10. To become shareholders, Emanuel, Gertrudes and Moni's contributed their shares in Zidane. *Id.*

On that same day, Zidane called for a capital increase, with the issuance of new shares to Moni's, which then paid them with valuable real property. *Id.* at ¶ 11. Immediately after, Emanuel, Gertrudes and Moni's left Zidane, transferring their shares—at no cost—to Dorkaeff and to Adolpho Dimantas ("Adolpho"), a lawyer who was very close to Emanuel. *Id.* Emanuel regularly retained Adolpho as his business lawyer, and Adolpho served as legal representative of Inversora Cadell and agent of Menirol in Brazil. *Id.*

**Figure 5: The Formation of Dorkaeff**



Approximately three months later, on July 17, 1999, Moni's left Dorkaeff and transferred its shares—at no cost—to Emanuel and Menirol. *Id.* at ¶ 12. Also, Dorkaeff's

8

shareholders reduced the company's capital, cancelling most of the shares then owned by Emanuel and all of the shares then owned by Gertrudes. *Id.* at ¶ 12. As reimbursement for their investment, Emanuel and Gertrudes received a credit then held by Dorkaeff against Mercantil (whose shareholders, at that time, were the same Emanuel and Gertrudes). *Id.* Ten days later, on July 27, 1999, Emanuel also left Dorkaeff, transferring his last shares—at no cost—to Menirol and Adolpho. *Id.*

**Figure 6: Moni's, Emanuel and Gertrudes Leave the Structure**



At the end of this process, Emanuel and Gertrudes were, formally at least, no longer owners of the dozens of valuable properties that were worth many millions of reais:[11] such valuable properties were transferred—at no cost—to Zidane, which was then owned by Dorkaeff (99.99%) and Adolpho (0.01%). Dorkaeff, in turn, was owned by Menirol (99.99%) and Adolpho (0.01%). *Id.* at ¶ 13.

In addition, many of the properties that Emanuel, Gertrudes and Moni's contributed to

---

[11] *See supra* note 10.

9

Zidane's capital were mortgaged to Menirol. *Id.* at ¶ 14. Menirol, however, never opposed or questioned these contributions because all these entities—Mercantil, Moni's, Menirol, Inversora Cadell, Zidane, Dorkaeff—were known to be effectively controlled by Emanuel. *Id.*

At some point, Menirol appointed two representatives: Nicolás Juan Alonso ("Nicolás") and Roberto Diego Licio Siniscalchi ("Roberto"), both partners of a Uruguayan law firm known for providing corporate and accounting services. *Id.* at ¶ 15. At least until December 18, 2019, Roberto was still registered as Menirol's president. *Id.* On numerous occasions, these representatives appointed Adolpho and Jehuda Edward Steinwurz (Suzana's former common-law spouse) ("Jehuda") as Menirol's agents in Brazil, giving them broad powers to act on behalf of the entity. *Id.* at ¶ 15, 17. Adolpho was also Inversora Cadell's legal representative in Brazil. *Id.* at ¶ 15. After Adolpho's death in November 2017, Ezra replaced him as one of Menirol's agents. *Id.* at ¶ 17.

In Brazil, Adolpho was a shareholder and registered manager of Zidane and Dorkaeff until July 2017, when he left the entities and transferred his shares to Mauricio Grabarz (Vivian's son-in-law) ("Mauricio"). *Id.* at ¶ 16. Ezra Moas (Vivian's spouse) ("Ezra") and Jehuda were registered managers of both entities. *Id.* Later, Jehuda left this position and was replaced by Mauricio. *Id.* Daniel Moas (Vivian's son) ("Daniel") also holds a compensated position at Zidane—whose registered managers, as set forth above, are his father (Ezra) and his brother-in-law (Mauricio). *Id.*

In the years that followed, whenever Emanuel and Gertrudes decided to purchase real property, they executed the purchases through Zidane or Dorkaeff. These entities also own other assets, such as bank accounts, and receive significant income from the rental of several real properties. *Id.* at ¶ 19. Sylvia and Eliane estimate that Zidane currently has a monthly

10

income of approximately BRL 500,000 (USD 96,500)[12] from the rental of the real properties in Brazil. *Id.*

Following the creation of this corporate structure, Emanuel, Gertrudes and their children made use of the assets and/or income from Zidane and Dorkaeff. *Id.* at ¶ 20. Emanuel and Gertrudes continued to live at the same house that since then has formally belonged to Zidane,[13] and for the last decades several family members have made use of real estate properties formally owned by Zidane. *Id.*

Alexandre, the only son among Emanuel and Gertrudes' children, has been directly involved in the development and management of this corporate structure, including the management and disposition of the assets and moneys that were then under the name of Zidane, Dorkaeff and Menirol. *Id.* at ¶ 21. After the structuring of this wealth preservation plan, Alexandre (in addition to Emanuel and Gertrudes) directed the transfer of money from Zidane, Dorkaeff and Menirol to foreign bank accounts. *Id.*

## IV.   Emanuel's Gift in Life to Alexandre—Sestini

As this wealth preservation plan was being devised and implemented, the main source of Emanuel's fortune was the operations that took place under the trading name of Germon's, mainly through Mercantil, the principal company of his business group. *Id.* at ¶ 22. Therefore, to complete his plan and protect his assets, Emanuel also sought to transfer relevant portion of Mercantil's goodwill to Alexandre. *Id.*

In February 1995, Alexandre incorporated Sestini Mercantil Ltda. ("Sestini"). *Id.* at ¶ 23. The only shareholders of this limited liability corporation were Alexandre, with 99% of

---

[12] Currency rate on March 30, 2020. *See USD-BRL Currency*, BLOOMBERG, http://bloomberg.com/quote/USDBRL:CUR (last visited March 30, 2020).

[13] The couple lived for decades at a house located at Rua Bolívia, n. 228, in São Paulo, SP, Brazil. Emanuel lived there until the day of his death, and Gertrudes only moved from the house a couple of years ago. *See* Fraga Decl, at ¶ 20 n. 9. The house is now for sale for BRL 16 million (approximately USD 3.1 million). *Id.*; *see also* De Luca Decl. at ¶ 23 and Ex. R.

11

the shares, and Ezra, with the remaining 1% of the shares. *Id.* Ezra was later replaced by Deborah Benedek ("Deborah"), Alexandre's spouse. *Id.* Sestini was headquartered at the same address as one of Mercantil's branches. *Id.*

When Mercantil was still operative, its corporate purpose was broad and encompassed the wholesale and retail sale of several products, as well as the export and import of these products in addition to manufactured and raw materials *Id.* at ¶ 24. But after the implementation of Emanuel's plan, Mercantil shut down all of its dozens of branches across various regions of Brazil and was reduced to a paper company, with a very restricted scope of business. *Id.*

Sestini, on the other hand, moved in the opposite direction. *Id.* at ¶ 25. When incorporated, its business purpose was registered as "manufactured artefacts, import and export in general." *Id.* When Mercantil reduced its scope, Sestini broadened its scope to encompass all of Mercantil's previous activities. *Id.*

In this way, Mercantil transferred much of its goodwill to Sestini. *Id.* at ¶ 26. In addition, Mercantil transferred to Sestini the brand that was used by the latter to begin its operations. *Id.* In 1991, Mercantil registered the brand "Sestini" with Instituto Nacional da Propriedade Industrial ("INPI"), the Brazilian federal agency for granting patents and registering trademarks. *Id.; see also* De Luca Decl. at ¶¶ 16-18 and Exs. K-M. In July 1997, Mercantil formally transferred to Sestini—at no cost—the rights and duties related to the use and exploration of the brand "Sestini." *See* Fraga Decl., at ¶ 26; *see also* De Luca Decl. at ¶ 19 and Ex. N.

Mercantil transferred to Sestini employees, market intelligence and knowhow inherent to Mercantil's operations. The stores and products that once had been regarded by customers, employees and business partners in general as Germon's—the trading name used by Mercantil—became known as Sestini. *See* Fraga Decl., at ¶ 27. Gradually, Emanuel, at an

12

advanced age, moved away from the business, which came to be controlled solely by Alexandre. *Id.* Alexandre has operated Sestini as a valuable and profitable enterprise with accumulated profits reserve of BRL 85 million (approximately USD 16.5 million) at the end of 2017. *Id.*

## V.   Emanuel's Death and the Probate Proceedings

Emanuel died on September 9, 2015, at the age of 86. *Id.* at ¶ 28. He left a will devising the disposable portion of his estate to Gertrudes. *Id.*; *see also* De Luca Decl., at ¶ 21 and Ex. P. Emanuel could not devise his entire estate to Gertrudes because, under Brazilian law, the decedent can dispose of only half of his estate by means of a will; the other half must go to "necessary heirs," which include descendants, ascendants, and possibly the decedent's spouse.[14] *See* Fraga Decl., at ¶ 29. Despite her status as Emanuel's spouse, Gertrudes has never been his necessary heir, due to the community property system that was adopted throughout their marriage and entitles her to 50% of the couple's common assets. *Id.*

Therefore, under Brazilian law, Emanuel's portion of 50% of the couple's common assets should be distributed as follows:

- Half (i.e. 25% of the couple's common assets) to Gertrudes, due to the will; and

- Half (i.e. 25% of the couple's common assets) evenly among Emanuel's six children (Sylvia, Eliane, Alexandre, Evelyn, Vivian, and Suzana).[15] *Id.* at ¶ 30.

In May 2016, following Emanuel's death, Suzana filed a probate petition with the Brazilian Court.[16] *Id.* at ¶ 31. Suzana was initially appointed by the court as the estate administrator, but she soon resigned from this position and was replaced by Gertrudes. *Id.*

Gertrudes' main duty as estate administrator was to prepare and submit a full profile of the decedent and his heirs, as well as a complete list of the estate and its value. *Id.* at ¶ 32.

---

[14] Código Civil [C.C.] arts. 1845-1846 (Braz.).

[15] Código Civil [C.C.] art. 1829 (Braz.).

[16] Proceeding n. 1045842-21.2016.8.26.0100.

13

Gertrudes listed only a few assets, however, including a single parcel of real property, a ten-year-old car, the shares of Mercantil (which had long been stripped of its assets), and some other distressed assets. *Id.*; *see also* De Luca Decl., ¶ 20 and Ex. O.  Gertrudes failed to disclose any of the highly valuable assets transferred by Emanuel to the entities he established and maintained under his control until the day of his death. *See* Fraga Decl., at ¶ 32.  Additionally, Gertrudes failed to list and provide detailed information regarding all the assets that Emanuel had abroad, even though Gertrudes conceded in the probate proceedings that Emanuel had assets outside of Brazil. *Id.*; *see also* De Luca Decl., Ex. O, at 4.

In light of Gertrudes' incomplete submission, Sylvia and Eliane petitioned the court, explaining that Emanuel owned many other assets, including the dozens of real properties that he had transferred to Zidane, Dorkaeff and Menirol, the funds that were in the bank accounts under these companies' names, the income from the rental of many of these properties, among others. *See* Fraga Decl., at ¶ 33.  Gertrudes denied that Emanuel actually owned and controlled these assets. *Id.*  Gertrudes even denied Emanuel's ownership of the house in which the couple had resided for decades, including at the time of Emanuel's death. *Id.*  Regarding the assets abroad, Gertrudes conceded their existence but refused to identify them or to provide detailed information about them. *Id.*

## VI.   Concealment of Assets

As explained above, Alexandre was aware of the details concerning Emanuel's wealth preservation plan, and has been involved in the development and management of the mentioned corporate structure, including the management and disposition of the assets under the name of Zidane, Dorkaeff and Menirol. *Id*, at ¶ 34.  In addition, after Emanuel's death, Alexandre hired Coldwell Banker Richard Ellis ("CBRE"), one of the largest real estate firms in the world, to obtain a professional assessment of the value of the real estate portfolio in Brazil under Zidane's name. *Id.*

14

Once the disagreement about Emanuel's estate arose, Gertrudes, Alexandre, Evelyn and Vivian began to take steps to conceal the existence of assets that should have been included in the probate proceeding. *See* Fraga Decl., at ¶ 35. As an example, Gertrudes left her long-term residence, which she had omitted from the probate proceedings, and moved to Israel. *Id.* In the recorded conversations that some of the family members had after the disagreement arose, Alexandre and Vivian conceded that Gertrudes left the home to avoid exposing the inconsistency in her claim that the house had not belonged to Emanuel when he died. *Id.*; *see also* De Luca Decl., at ¶¶ 25-26 and Exs. T-U.[17]

Concerned about Alexandre and Gertrudes' efforts to hide assets, Sylvia's spouse, Allen Bruce Klein ("Allen"), requested from CBRE the evaluation of the assets that Alexandre had previously commissioned. *See* Fraga Decl., at ¶ 36; *see also* De Luca, at ¶ 22 and Ex. Q. CBRE declined to share the evaluation without Alexandre's authorization, which he refused to give. *See* Fraga Decl., at ¶ 36; *see also* De Luca, Ex. Q. Despite Sylvia and Eliane's efforts, Alexandre refuses to provide any information regarding money transfers to foreign bank accounts and the assets that Emanuel and Gertrudes own or owned outside of Brazil. *See* Fraga Decl., at ¶ 36.

## VII. The Brazilian Proceedings

On March 3, 2020, Sylvia and Eliane filed suit against the Brazilian Defendants. *See* Fraga Decl., at ¶ 37; *see also* De Luca Decl., at ¶ 12 and Ex. G. The lawsuit alleges that the Brazilian Defendants concealed or failed to disclose to the probate court the full extent of Emanuel's estate. *See* Fraga Decl., at ¶ 37. Under Brazilian law, every participant in a probate

---

[17] In a conversation that took place on February 21, 2019, Alexandre told Bryan Nathan Klein ("Bryan"), Sylvia's son, in detail, that Gertrudes' lawyer in Brazil directed her to remove all personal items from the house at Rua Bolivia (at which the couple had lived for decades), including clothes, vases, rugs and photographs, which she did before going to Israel. *See* De Luca Decl., Ex. T, at 23-26. In a conversation that took place on February 27, 2019, Vivian and Ezra confirmed these facts. *See* De Luca Decl., Ex. U, at 6-7.

proceeding must disclose the estate's assets to the court, to the best of his or her knowledge. *Id.* at ¶ 38. If an heir knowingly fails to disclose an asset and is found to be acting in bad faith, he or she is deemed to be concealing the estate's assets and is penalized by losing his or her inheritance rights over the assets that he or she failed to disclose.[18] *Id.* This obligation includes any assets located abroad, as foreign assets must be disclosed by the heirs to the probate court, which will then consider their value in order to calculate the distributions of the assets in Brazil. *Id.*

In addition, in Brazil, the law treats every father-to-son gift in life as an upfront payment of the son's inheritance.[19] *Id.* at ¶ 39. If the gift is worth more than what the son could receive under the laws of intestacy, the excess is returned to the estate to be distributed among the remaining heirs. *Id.* As a consequence, Brazilian law requires heirs to disclose all gifts they received during the decedent's lifetime. If an heir fails to disclose the gift's existence and is found to be acting in bad faith, he is also deemed to be concealing estate assets and is penalized by losing his rights over these concealed assets.[20] *Id.*

There is strong evidence that the Brazilian Defendants are aware of many other assets that must be disclosed in the Brazilian Proceedings, but knowingly failed to inform the probate court about them. *Id.* at ¶ 40. When filing the relevant declaration, Gertrudes listed only a few assets and later denied the existence of any other assets in Emanuel's estate. *Id.* She also conceded that Emanuel had assets abroad but refused to give detailed information about them. *Id.* Alexandre failed to disclose the gift he received from Emanuel, namely the relevant portion of Mercantil's goodwill, which was transferred to Sestini. *Id*

The Applicants have petitioned the Brazilian Court for an order penalizing the Brazilian Defendants for failing to disclose assets and returning the undisclosed assets to Emanuel's

---

[18] Código Civil [C.C.] art. 1992 (Braz.).
[19] Código Civil [C.C.] art. 544 (Braz.).
[20] Código Civil [C.C.] arts. 1992, 2002 (Braz.).

estate. *Id.* ¶ 41. In support of their petition, the Applicants submitted several pieces of evidence to the Brazilian Court (including audio recordings of conversations between Bryan and Alexandre, Vivian and Ezra) concerning: the only formal transfer of Emanuel's assets to Zidane, Dorkaeff and Menirol; Alexandre's current *de facto* control over these entities; and the existence of Emanuel and Gertrudes' assets abroad. *Id.*; *see also* De Luca Decl., ¶¶ 25-26 and Exs. T-U.[21]

## VIII. The Required Discovery

In furtherance of the Brazilian Proceedings, the Applicants seek to obtain discovery from two wire-transfer clearing houses located in this District. *See* Fraga Decl. ¶ 47. As set forth above, Emanuel, Gertrudes and Alexandre directed the transfer of funds from Brazil to foreign bank accounts. *Id.* at ¶¶ 42, 44. Accordingly, the Applicants seek to obtain evidence showing that Emanuel, Gertrudes, Alexandre, Evelyn, Vivian, Suzana, the companies controlled by Emanuel and Alexandre (Mercantil, Moni's, Zidane, Dorkaeff, Menirol, Inversora Cadell and Sestini), or other intermediaries[22] have transferred to foreign accounts

---

[21] The Applicants also submitted records of other communications, including (i) a transcript of a conversation among the Applicants, Arnaldo (Eliane's husband), Kenneth Alex Klein (Sylvia's son) and Claudia Stein Vieira, a Brazilian lawyer, who had been contacted by Emanuel before his death in order to counsel him as to a possible succession plan, *see* De Luca Decl., at ¶ 24 and Ex. S; and (ii) notarial minutes of a conversation among the Applicants and other family members through the messaging application WhatsApp between April and June 2016, *see* De Luca, at ¶ 27 and Ex. V. All these documents contain relevant information regarding the concealment of Emanuel's estate's assets.

[22] These other intermediaries may be: Deborah; Ezra (Zidane and Dorkaeff's registered manager, and Menirol's agent in Brazil); Daniel (who also holds a compensated position at Zidane); Maurício Benedek Moas (Vivian and Ezra's son); Mauricio Grabarz (Vivian's son-in-law, and Zidane and Dorkaeff's registered manager); Yossef Shtibelman ("Yossef") (Evelyn's spouse); Jehuda (Suzana's former common law spouse, Zidane and Dorkaeff's former registered manager, and Menirol's former agent in Brazil); Adolpho (who had a close relationship with Emanuel, and was Zidane and Dorkaeff's shareholder and registered manager, and Menirol's agent in Brazil); Poa Textil S.A. (a textile company owned by Adolpho); Nicolás Juan Alonso (Menirol's representative); Roberto Diego Licio Siniscalchi (Menirol's representative and registered president); Claudia Blancato ("Claudia") (who was a manager at Mercantil from 1979 to 1990, and has been working as a real estate agent at Zidane since 1990); Timao LLC ("Timao") (an entity incorporated in the United States, owned by

17

funds belonging to Emanuel and therefore to his estate. *Id.* at ¶ 46.

The Discovery Subjects are CHIPS and the Federal Reserve Bank, as a provider of the Fedwire Funds Service through its Wholesale Product Office ("Fedwire"). These Discovery Subjects are commonly known to act as clearinghouse banks for U.S. dollar-denominated wire transfers between domestic banks and international.

Fedwire, operated by the Federal Reserve Bank "processes and settles payment orders individually in real time throughout the operating day. Participants can send up to one penny less than $10 billion in a single transaction… [It] frequently handles what are considered 'retail' payments (i.e., funds transfers that are not interbank transfers). The latter includes funds transfers sent by or to consumers."[23]

CHIPS provides both transmission of instruction messages and settlement of funds between institutions to process international U.S. dollar funds transfers made among international banks. CHIPS "is the only private-sector ACH and wire operator in the United States, clearing and settling nearly $2 trillion in U.S. dollar payments each day, representing half of all commercial ACH and wire volume."[24] Final settlements of transfers made through CHIPS "occur through adjustments in special account balances at the Federal Reserve Bank of New York."[25] CHIPS estimates that it handles 95 percent of all U.S. dollar payments moving between countries.[26]

Together, CHIPS and Fedwire constitute the primary network in the United States for

---

Alexandre and Deborah); and Ricardo Del Giglio ("Ricardo") (Alexandre's cousin, owner of Dymax International Services, Inc, which is Timao's registered agent). *Id.* at ¶¶ 43-44.

[23] *Fedwire Funds Service Disclosure*, THE FEDERAL RESERVE 5-6 (Dec. 23, 2019), https://www.frbservices.org/assets/financial-services/wires/funds-service-disclosure.pdf. *See also Fedwire® and National Settlement Services*, FEDERAL RESERVE BANK OF NEW YORK, https://www.newyorkfed.org/aboutthefed/fedpoint/fed43 (last visited April 14, 2020).

[24] *Our History*, THE CLEARING HOUSE, https://www.theclearinghouse.org/about/history (last visited March 30, 2020).

[25] Sudhindra Bhat, *Financial Management: Principles and Practice* 170 (2d ed. 2008).

[26] *CHIPS*, FEDERAL RESERVE BANK OF NEW YORK, https://www.newyorkfed.org/aboutthefed/fedpoint/fed36.html (last visited March 27, 2020).

18

both domestic and foreign large transactions denominated in U.S. dollars.[27] Thus, the transfers the Applicants need to identify were almost certainly processed and settled by one or both of the Discovery Subjects. Because the Applicants do not have information about these transfers—such as the financial institutions that were the final recipients of the moneys transferred—in part due to concealment by Gertrudes, Alexandre, and others, discovery from both CHIPS and the Federal Reserve Bank is likely the only way through which the Applicants may obtain it.

Accordingly, the Applicants seek discovery in this District from the Discovery Subjects. Copies of proposed subpoenas to the Discovery Subjects are attached to the De Luca Declaration as Exhibits A and B. A copy of the proposed Order granting the aforementioned relief is being submitted in conjunction with this application.

## ARGUMENT

### I.   THE § 1782 APPLICATION MEETS EACH OF THE STATUTORY REQUIREMENTS FOR DISCOVERY

Section 1782 allows federal district courts to authorize litigants to obtain evidence for use in foreign proceedings. In pertinent part, 28 U.S.C. § 1782(a) provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal ... The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

---

[27] See Will Kenton, *Clearing House Interbank Payments System (CHIPS)*, INVESTOPEDIA (Apr. 17, 2018), https://www.investopedia.com/terms/c/clearing-house-interbank-payments-system-chips.asp. *See also Payment Systems in the United States*, BANK FOR INTERNATIONAL SETTLEMENTS 443 (Apr. 1, 2003), https://www.bis.org/cpmi/publ/d53.pdf ("There are two major large-value payment transfer systems in the United States: (1) Fedwire, operated by the Federal Reserve, and (2) CHIPS, operated by the Clearing House Interbank Payments Company L.L.C. (CHIPCo). Generally, these payment systems are used by financial institutions and their customers to make large-dollar, time-critical transfers. In addition, financial institutions may use separate communication systems to send payment instructions to their correspondents for the transfer of correspondent balances or to initiate Fedwire or CHIPS payments.").

19

Thus, a district court is authorized to grant an application pursuant to 28 U.S.C. § 1782 if an applicant satisfies the following statutory requirements: (1) the party from whom the discovery is sought resides or is found in the district where the application is made; (2) the discovery is intended "for use" in a foreign proceeding; and (3) the application is made by an "interested person" in the foreign proceeding. *Id.* This application meets all the statutory requirements.

### A. The Discovery Subjects Reside or Are Found in the Southern District of New York

CHIPS is domiciled in Manhattan and registered with the New York State Department of State. *See* De Luca Decl., at ¶ 8 and Ex. C; *see also id.* at ¶¶ 5, 9-10 and Exs. D-E.[28] The Federal Reserve Bank is headquartered in Manhattan. *Id.* at ¶¶ 5, 11, and Ex. F.[29] Therefore, both entities are "found" in this district. *See In re del Valle Ruiz,* 939 F.3d 520, 528 (2d Cir. 2019) (holding that "§ 1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process."); *see also In re Ex Parte Application of Kleimar N.V.,* 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (holding that a 28 U.S.C. § 1782 target was found in this district where, among other things, it "appears to conduct systematic and regular business in the United States and New York."); *Lirola v. Lanata,* No. 19-mc-80173-LB, 2019 U.S. Dist. LEXIS 117590, at *4 (N.D. Cal. Jul. 12, 2019) (finding that the discovery target was located in the district within the meaning of 28 U.S.C. § 1782 because it was headquartered there); *Gov't of Mong. v. Itera Int'l Energy,* No. 3:08-mc-46-J-32MCR, 2009 U.S. Dist. LEXIS 144214, at *12 (M.D. Fla. Nov. 10, 2009) ("Surely, it does not run afoul of 'fair play and substantial justice' to be subject to the jurisdiction of the Courts where a company maintains its corporate headquarters for its local operation.").

---

[28] *See supra* note 2.

[29] *See supra* note 3.

20

Accordingly, the first statutory requirement is met with respect to both Discovery Subjects.

### B. The Requested Discovery Is Sought for Use in a Proceeding Before a Foreign Tribunal

The discovery sought must be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782 (a). In *Euromepa II*, the Second Circuit held that the "for use in a proceeding in a foreign or international tribunal" factor turns on (1) whether there actually is a foreign proceeding; and (2) whether the foreign proceeding is adjudicative in nature. *Euromepa, S.A. v. R. Esmerian, Inc. (Euromepa II)*, 154 F.3d 24, 27 (2d Cir. 1998). *See also In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017) (finding the "for use" statutory requirement met where the applicants were "parties to that [foreign] proceeding," and "retain[ed] the procedural right to submit the requested documents to the magistrate overseeing the investigation.").

In this case, there is an actual adjudicative proceeding in Brazil, as the Brazilian Proceedings require the Brazilian Court to determine the parties' rights and liabilities. Moreover, the Applicants seek the requested discovery from the Clearing House and the Federal Reserve Bank for use in the Brazilian Proceedings; namely, to offer evidence of other assets of Emanuel's estate and prove that the Brazilian Defendants were aware of the existence of these assets but failed to disclose them to the probate court in Brazil. *See* Fraga Decl., at ¶¶ 46-47.

The fact that the Brazilian Defendants in the Brazilian Proceedings have not yet been served is of no consequence. Indeed, it is well-settled that courts may grant a 28 U.S.C. § 1782 application for evidence to be used in a proceeding that has not yet begun but is reasonably contemplated. *Intel*, 542 U.S. at 258-9. In *Intel*, the Supreme Court held that:

> [S]ection 1782(a) does not limit the provision of judicial assistance to "pending" adjudicative proceedings. In 1964... Congress also deleted the requirement that a proceeding be "pending." When Congress acts to amend a

21

statute we presume it intends its amendment to have a real and substantial effect.

*Id.* (internal citations omitted). *See also In re Letter of Request from Crown Prosecution Service of United Kingdom*, 870 F.2d 686, 690-91 (D.C. Cir. 1989) ("none of [the cases] requir[e] that the proceeding be underway prior to the request for aid… we will not treat Congress' deletion of the word 'pending' as a mistake or mere accident.") (internal citations omitted); *In re Wilhelm*, 470 F. Supp. 2d 409 (S.D.N.Y. 2007) (granting relief under 28 U.S.C. § 1782 where a Dutch criminal proceeding was within reasonable contemplation, not pending or imminent); *Mees v. Buiter*, 793 F.3d 291 (2d Cir. 2015) (authorizing discovery for use in a contemplated Dutch proceeding); *In re Application of Iraq Telecom Ltd.*, No. 18-MC-458 (LGS) (OTW), 2019 U.S. Dist. LEXIS 176149, 2019 WL 5080007, at *3-4 (S.D.N.Y. Oct. 10, 2019) (denying motion for reconsideration of order granting discovery requests under 28 U.S.C. § 1782 in part "[b]ecause Petitioner had already filed complaints in the DIFC litigation" and, therefore, "[the] proceedings in the DIFC courts were 'within reasonable contemplation' and not merely speculative."). Because the Brazilian Proceedings have actually been filed—*see* Fraga Decl. at ¶ 37; *see also* De Luca Decl., at ¶ 12 and Ex. G—the § 1782 Application satisfies the requirement that a proceeding be within reasonable contemplation. As such, Applicants meet the second mandatory requirement.

## C. The Application Is Made By "Interested Persons"

An "interested person" includes a party to the foreign litigation. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) ("No doubt litigants are included among, and may be the most common example of, the 'interested person [s]' who may invoke § 1782"). *See also Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.*, No. 14-CV-9997 (CM), 2015 U.S. Dist. LEXIS 18388, 2015 WL 3439220, at *6 (S.D.N.Y. Jan. 6, 2015) ("In *Intel*, the Supreme Court held that 'interested persons' include anyone, such as litigants and foreign officials, who has a reasonable interest in obtaining the information requested."). Here, the

22

Applicants clearly are "interested persons" in their capacity as Emanuel's heirs and litigants in the Brazilian Proceedings.

## II.    EACH OF THE DISCRETIONARY FACTORS WEIGHS STRONGLY IN FAVOR OF GRANTING THE APPLICATION

Where, as here, an application satisfies the statutory requirements, the district court also considers a number of discretionary factors in determining whether to grant or deny the application. In doing so, the Court should keep in mind the "twin aims" of the statute: (1) providing an efficient means of assistance to participants in international litigation in our federal courts, and (2) encouraging foreign countries by example to provide similar means of assistance to our courts. *See In re Application of Grupo Qumma*, No. M 8-85, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486, at *11 (S.D.N.Y. Apr. 22, 2005) ("Section 1782's 'underlying policy should generally prompt district courts to provide some form of discovery assistance.'") (quoting *Euromepa, S.A. v. R. Esmerian, Inc. (Euromepa I)*, 51 F.3d 1095, 1102 (2d Cir. 1995). *See also Application of Malev Hungarian Airlines*, 964 F.2d 97, 100, 102 (2d Cir. 1992) (noting "twin aims" of statute in reversing district court's denial of discovery under 28 U.S.C. § 1782). Indeed, "the statute has, over the years, been given increasingly broad applicability." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

To further the purpose of the statute, the Supreme Court has delineated the following factors for district courts to consider when deciding whether to grant a discovery request pursuant to 28 U.S.C. § 1782: (a) whether the person from whom the discovery is sought is a participant in the foreign proceeding; (b) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (c) whether the 28 U.S.C. § 1782 application conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (d) whether the 28 U.S.C. § 1782

23

application contains unduly intrusive or burdensome discovery requests. *See Intel*, 542 U.S. at 264–66. Here, these factors support granting the 28 U.S.C. § 1782 Application.

### A. The Discovery Subjects Are Not Participants in the Brazilian Proceedings

The first discretionary factor leans strongly in favor of granting the requested discovery because the Clearing House and the Federal Reserve Bank are not, and are not likely ever to be, participants in the Brazilian Proceedings. *See* Fraga Decl., at ¶ 52. The Supreme Court has recognized that "nonparticipants in the foreign proceeding may be outside of the foreign tribunal's reach; hence their evidence, available in the United States, may be unobtainable absent 28 U.S.C. § 1782 (a) aid." *Intel*, 542 U.S. at 264. Indeed, this Court has previously held that a respondent's "status as a non-party in the foreign actions weighs in favor of granting [the] application." *In re Application Pursuant to* 28 U.S.C. § 1782 *for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries & other non-participants for use in Actions Pending in the Norway*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008); *see also In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 292 (S.D.N.Y. 2008), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) (holding that the first discretionary factor favored granting of the application where the respondent was not subject to the jurisdiction of the foreign tribunals).

Here, the Clearing House and the Federal Reserve Bank are neither parties to the Brazilian Proceedings nor subject to jurisdiction in Brazil. *See* Fraga Decl., at ¶ 52. Therefore, the Court should grant the § 1782 Application.

### B. The Nature of the Brazilian Court, the Character of the Brazilian Proceedings, and the Receptivity of the Brazilian Court Support Granting the Discovery Requested

As a threshold matter, the Brazilian Proceedings are judicial proceedings that are adjudicative in nature. *See* Fraga Decl., at ¶ 41. Consequently, the nature of the Brazilian Proceedings weighs in favor of granting the § 1782 Application. *See, e.g., Jiangsu*, 2015 U.S.

24

Dist. LEXIS 18388, at 15 (discovery under 28 U.S.C. § 1782 is available for use in administrative and quasi-judicial proceedings, as well as strictly judicial proceedings and arbitrations).

Moreover, as set out in the Fraga Declaration, the Brazilian Court will very likely be receptive to the requested discovery. *Id.* at ¶ 51. The Second Circuit has made clear that, in examining receptivity, a district court should consider neither the *discoverability* of the evidence in the foreign proceeding nor the *admissibility* of evidence in the foreign proceeding. *Brandi-Dohrn*, 673 F.3d at 82. *See also Fleischmann v. McDonald's Corp. (In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Braz.),* 466 F. Supp. 2d 1020, 1034 (N.D. Ill. 2006) ("[a]n application for discovery under 1782(a) includes neither a foreign-admissibility rule nor a foreign-discoverability rule."); *Euromepa I*, 51 F.3d at 1101 (because foreign courts could always rule upon the propriety of reliance on evidence obtained through the cooperation provided by American courts when it was presented to them, "the drafters of section 1782 regarded it as both unnecessary and undesirable to let the propriety of discovery with the aid of an American court depend on discoverability and admissibility under foreign law.") (quoting Hans Smit, *Recent Developments in International Litigation*, 35 S. Tex. L. Rev. 215, 235–36 (1994)).

Therefore, in ruling on a 28 U.S.C. § 1782 application, a district court should not engage in "speculative forays into legal territories unfamiliar to federal judges," and should limit its inquiry "only [to] authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782." *Euromepa I*, 51 F.3d at 1109-10. Authoritative proof is limited to proof "embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures." *Id.* at 1104. Here, no such proof exists. On the contrary, given that Brazil is a signatory to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention"),

25

March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 744, Brazil is presumptively receptive to American judicial assistance. *Id.* at ¶ 49. *See In re O'Keeffe*, 646 F. App'x 263, 267 (3d. Cir. 2016) (finding that "Hong Kong is a signatory to the Hague Evidence Convention, and thus the Hong Kong court is likely 'receptive to American judicial assistance.'") (*citing In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) ("Venezuela has indicated its receptivity to federal judicial assistance by its signature of treaties facilitating such cooperation.")); *see also* Fraga Decl., at ¶ 48.

## C. The Applicants Do Not Seek to Circumvent Proof-Gathering Restrictions or Other Policies

This Application is brought in good faith and does not seek to circumvent Brazilian restrictions with respect to foreign proof gathering or other polices. To the contrary, Brazilian law, which governs the Brazilian Proceedings, does not prohibit the parties from seeking the assistance of U.S. courts in collecting evidence. *See Fraga Decl.,* at ¶¶ 49-50. Typically, courts weigh the third *Intel* factor against the applicant only where they find that an application is brought in bad faith. *See In re Application of Hill*, No. M 19-117 (RJH), 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007) ("Absent any indication of bad faith on [the applicant's] part, the Court is simply unwilling to weigh the request for 28 U.S.C. § 1782 assistance itself as a negative discretionary factor") (internal quotations omitted); *In re Gemeinschaftspraxis Dr. Med. Schottdorf*, No. MI9-88 (BSJ), 2006 U.S. Dist. LEXIS 94161, 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006). Indeed, this Court has granted 28 U.S.C. § 1782 applications even when the discovery sought was unavailable in the foreign jurisdiction or when the applicant has not first tried to obtain the discovery overseas. *See, e.g., In re Apostolos Mangouras to Conduct Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. 1782*, No. 17-mc-172, 2017 U.S. Dist. LEXIS 179534, 2017 WL 4990655, at *6-7 (S.D.N.Y. Oct. 30, 2017).

Specifically with respect to Brazil, courts routinely permit discovery under 28 U.S.C. § 1782. *See, e.g., In re de Aquino Chad*, No. 19mc261, 2019 U.S. Dist. LEXIS 100483, 2019

WL 2502060, at *4 (S.D.N.Y. Jun. 17, 2019) (granting 28 U.S.C. § 1782 discovery against some financial institutions for use in a Brazilian bankruptcy proceeding); *Fleischmann*, 466 F. Supp. 2d at 1034 (granting 28 U.S.C. § 1782 discovery for use in a Brazilian proceeding before a Brazilian labor court); *In re De Melo Pimenta*, 942 F. Supp. 2d 1282, 1287 (S.D. Fla. 2013) (granting 28 U.S.C. § 1782 discovery for use in a Brazilian proceeding involving a dispute over a will probated in São Paulo).

Since the § 1782 Application is brought in good faith and does not seek to circumvent Brazilian discovery procedures, the Court should grant the § 1782 Application.

### D. The Requested Discovery Is Relevant and Not Unduly Burdensome

28 U.S.C. § 1782 provides that discovery taken under the statute is governed by the Federal Rules of Civil Procedure. 28 U.S.C. § 1782(a). Thus, the Court "should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302.

The scope of permissible discovery under Fed. R. Civ. P. 26 "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Gorsoan Ltd.*, No. 13 Misc. 397 (PGG), 2014 U.S. Dist. LEXIS 175613, 2014 WL 7232262, at *5 (S.D.N.Y. Dec. 10, 2014), *aff'd sub nom. Gorsoan Ltd. & Gazprombank OJSC for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery v. Bullock*, 652 F. App'x 7 (2d. Cir. 2016). In fact, "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

The discovery that the Applicants seek is plainly relevant. As set forth above, Emanuel, Gertrudes, Alexandre, Evelyn, Vivian, the companies controlled by Emanuel and Alexandre (Mercantil, Moni's, Zidane, Dorkaeff, Menirol, Inversora Cadell and Sestini), or other

intermediaries[30] have transferred funds belonging to Emanuel, and therefore to his estate, to foreign accounts.

The details of those transfers are not only relevant to the Brazilian Proceedings, but also essential to prove (i) how much was diverted from—and, therefore, how much must return to—Emanuel's estate; and (ii) that the Brazilian Defendants knowingly failed to disclose assets in the Brazilian Proceedings. *See* Fraga Decl., at ¶ 45. In addition to being relevant, the requested discovery is not unduly intrusive or burdensome, in that it can be readily identified by the likely custodians and is unlikely to consist of voluminous information. *See In re Application of Inversiones y Gasolinera Petroleos Venezuela,* No. 08-20378-MC, 2011 U.S. Dist. LEXIS 5201, 2011 WL 181311, at *13 (S.D. Fla. Jan. 19, 2011) (allowing discovery under 28 U.S.C. § 1782 absent "specific showing" of burdensome or intrusive nature of request by respondent). As set out in the proposed subpoenas (Exs. A & B), the Applicants seek documents and information regarding wire transfers made by a limited number of individuals and entities. The Applicants are seeking the types of records that the clearing houses maintain and produce in the regular course of business.[31] In fact, this Court has previously granted requests for similar discovery from these institutions under 28 U.S.C. § 1782. *See, e.g.,* Order, *In Re Catalyst Managerial Services, Dmcc,* No. 1:15-mc-408 (S.D.N.Y. Feb. 26, 2016), ECF No. 6 (granting discovery pursuant to 28 U.S.C. § 1782 from several financial institutions and from CHIPS); Order, *In Re Application of de Araujo Bertolla,* No. 1:17-mc-284 (S.D.N.Y. Nov. 13, 2017) (granting discovery pursuant to 28 U.S.C. § 1782 from several financial institutions and from CHIPS); Order, *In Re Cooperatieve Rabobank U.A. et al,* 1:20-mc-89, ECF No. 11 (S.D.N.Y. Feb. 18, 2020) (granting discovery pursuant to 28 U.S.C. § 1782 from CHIPS and other

---

[30] *See supra* Note 22.

[31] In fact, the Clearing House dedicates a page on its website to instructions for subpoenas. *See Subpoena Instructions,* THE CLEARING HOUSE, https://www.theclearinghouse.org/about/subpoena-instructions (last visited April 14, 2020).

28

financial institutions); Order, *In The Matter of the Ex Parte Application of Andrew Reginald Yeo and Gess Michael Rambaldi,* 1:18-mc-483, ECF No. 6 (S.D.N.Y. Nov. 1, 2018) (granting discovery pursuant to 28 U.S.C. § 1782 from several financial institutions and from the Federal Reserve Bank); Order, *In The Matter of the Ex Parte Application of Andrew Reginald Yeo and Gess Michael Rambaldi,* 1:17-mc-484, ECF No. 9 (S.D.N.Y. Jan. 8, 2018) (granting discovery pursuant to 28 U.S.C. § 1782 from several financial institutions and from the Clearing House).

## III.    *EX PARTE* RELIEF IS CUSTOMARY AND APPROPRIATE HERE

District courts may and customarily do resolve applications for discovery pursuant to 28 U.S.C. § 1782 through *ex parte* proceedings. *See, e.g., Gushlak v. Gushlak,* 486 Fed. App'x 215, 217 (2d Cir. 2002); *Esses v. Hanania,* 101 F.3d 873, 874 (2d Cir. 1996); *In re Ishihara Chem. Co.,* 121 F. Supp. 2d 209, 210 n.1 (E.D.N.Y. 2000), *vacated as moot,* 251 F.3d 120 (2d Cir. 2001); *In re Letter of Request from Supreme Court of Hong Kong,* 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991); *see also In re Application of Societe d'Etude de Realisation et d'Exploitation Pour le Traitement du Mais,* No. 13-MC-266, 2013 U.S. Dist. LEXIS 167219, 2013 WL 6164435, at *2 n.1 (E.D. Pa. Nov. 22, 2013); *In re Mesa Power Group, LLC,* No. 2:11-mc-280-ES, 2012 U.S. Dist. LEXIS 179870, 2012 WL 6060941, at *9-10 (D.N.J. Nov. 20, 2012) ("Applications pursuant to 28. U.S.C. § 1782 are frequently granted *ex parte* where the application is for the issuance of subpoenas and the substantial rights of the subpoenaed person are not implicated by the application.").

The Discovery Subjects' due process rights are not violated because they may challenge any discovery request by moving to quash the subpoenas sought here pursuant to Fed. R. Civ. P. 45 (c)(3). *Gushlak,* 486 Fed. Appx. at 217 (2d Cir. 2012). *See also In re Pallares,* No. 10-cv-02528-PAB, 2010 U.S. Dist. LEXIS 115240, 2010 WL 4193072, at *4-5 (D. Colo. Oct. 20, 2010) (granting the *ex parte* application because it was appropriate and noting that, "to the extent the respondents disagree or seek modification of the requirements, such can be the

subject of appropriate motions."); *In re Letter of Request from Supreme Court of Hong Kong*, 138 F.R.D. at 32 n. 6 ("[S]uch *ex parte applications* are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it.").

This Court has granted 28 U.S.C. § 1782 applications on an *ex parte* basis with no further requirements. *See, e.g., In re Hornbeam Corp.*, No. 14 Misc. 424 (Part 1), 2015 U.S. Dist. LEXIS 142361, at *12 ("Given the widespread recognition that § 1782 applications are properly handled *ex parte*, the fact that [the applicant] brought a § 1782 application might alone be understood as a 'good and sufficient reason' for proceeding *ex parte* that satisfies the substance of Local Rule 6.1(d).").

For these reasons, this Court should grant the 28 U.S.C. § 1782 Application *ex parte*.

## CONCLUSION

WHEREFORE, Applicants pray for an order of this Court:

(1) Granting discovery pursuant to 28 U.S.C. § 1782;

(2) Authorizing the issuance of the subpoenas attached to the Declaration of E. Martin De Luca (Exs. A & B);

(3) Granting such other and further relief as this Court deems just and proper.

Dated:     New York, New York
           April 30, 2020

Respectfully submitted,

KOBRE & KIM LLP

John D. Couriel
john.couriel@kobrekim.com
Kobre & Kim LLP
201 South Biscayne Boulevard
Suite 1900
Miami, Florida 33131
Tel: (305) 967-6100
Fax: (305) 967-6120

30

E. Martin De Luca
martin.deluca@kobrekim.com
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220

*Attorneys for Applicants Sylvia Benedek Klein and Eliane Benedek Segal*

31